**In re: C.G., A Minor**

**Appeal of: M.P., Natural Mother**

Superior Court of Pennsylvania.

Submitted Nov. 4, 2001.
Filed Feb. 1, 2002.

Troy J. Harper, Brookville, for M.P., appellant.

John M. Ingros, Puxsutawney, for L.G.

Heidi U. Dennison, Brookville, for C.G.

R. Edward Ferraro, Brockway, for Jefferson County C.Y.S.

Before CAVANAUGH, ORIE MELVIN and OLSZEWSKI, JJ.

ORIE MELVIN, J.

¶1 Appellant, M.P., appeals from the decree terminating her parental rights to C.G., her son. She challenges whether the petitioner satisfied its burden of proof in establishing the grounds for termination. While the merits of Appellant's issues are unremarkable, we find noteworthy the novel issue presented by a recent amendment to the Orphans' Court Rules governing exceptions in termination proceedings, which calls into question the timeliness of this appeal. Accordingly, before addressing the merits we will first consider whether it is appropriate to apply the new Rule in light of the fact that the Rule changed during the pendency of the litigation.

¶2 The facts, as gleaned from the record, reveal that M.P. (mother) and L.G. (father) are the biological parents of C.G. (d.o.b. 02/28/95). Mother and father have never been married but were still living together at the time of the termination hearing. Jefferson County Children and Youth Services (CYS) first became involved with the parties on October 30, 1996, following a dispute between mother and father during which mother chased father with a hammer and threw C.G. to the floor. At the time of this incident C.G. was only 20 months old. As a result of this incident, mother was convicted of endangering the welfare of a child, recklessly endangering another person, and harassment, and ultimately served two years of probation in Clearfield County. C.G. has been in the custody of CYS since December 10, 1996. On January 29, 1997, C.G. was adjudicated dependent on the basis of the alleged domestic violence between the parents and their possible drug and alcohol abuse. On March 20, 1997, the child was placed in foster care with his paternal Aunt and Uncle, who provided a stable environment. On March 25, 1998, CYS changed its goal to adoption.

¶ 3 On May 26, 1999, a petition for Involuntary Termination of Parental Rights was filed by CYS. The petition alleged that mother and father could not adequately care for C.G. and, pursuant to 23 Pa.C.S.A. § 2511(a)(5), the conditions that led to the original placement of the child with CYS had not been remedied despite opportunities afforded to the parents to remedy the conditions. On July 6, 1999, the trial court conducted a hearing on the petition. During the hearing, Dr. Vivian Ready, a licensed psychologist employed by St. Claire Child Services, testified that the child's mental health is severely impaired by Attention Deficit Hyper–Activity Disorder (ADHD). She further testified that C.G. has displayed other behaviors that tend to relate to mental illness but those behaviors had yet to be related to a specific disorder. In addition to the in-home services provided by St. Claire Child Services, C.G. also attended Headstart with an SSI worker several days a week and is under the care of a neurologist and his family doctor. The behavior displayed by C.G. includes severe hyperactivity and inattentiveness, aggressive behavior, and fits of violence (punching, biting, and scratching) directed at himself as well as others. C.G.'s behavior was characterized as dangerous, as he has no concept of whether he is endangering himself or others. A structured and stable environment and close monitoring were noted as being vital to meet C.G.'s special needs. Also noted as important was the need to teach C.G. to monitor his own activities so he may understand when a situation is dangerous. Testimony was presented that his current guardians have been very cooperative in providing feedback and working very hard to provide the considerable amount of structure recommended by the caregivers.

¶ 4 From the time CYS obtained custody in December of 1996, until court-ordered visitation was established in October of 1998, both parents had a history of excessively failing to show up for and canceling visitations scheduled for once a week. The parents failed to appear for visitation from April 1997 until July 1997, a four month period; failed to appear for visitation from November of 1997 until April of 1998, a five month period; and failed to appear for visitation from April of 1998 until August of 1998, a four month period. During this time period the parents moved quite frequently, and it was often very difficult for CYS to contact them, as they sometimes did not have a phone or the phone was disconnected. The relationship between mother and father was characterized as off and on and generally unstable. The parents have a history of domestic abuse and alcohol and/or drug abuse. Despite the reasonable efforts of CYS to assist mother and father in remedying the circumstances and conditions which led to the child's placement, they have been largely uncooperative and have repeatedly failed to successfully complete drug and alcohol and mental health counseling recommended by CYS. C.G. has bonded with his foster parents, and they wish to adopt him.

¶ 5 Following the hearing, each party submitted briefs and proposed findings of fact. On February 21, 2001, the trial court entered an Adjudication and Decree Nisi terminating mother's and father's parental rights. Exceptions were filed, and following oral argument, the trial court entered an order dated April 3, 2001 denying the Exceptions and a Final Decree dated April 4, 2001 terminating mother's and father's parental rights. On May 2, 2001, mother filed a Notice of Appeal [1].

1. Father has not appealed, and there are no issues before us with regard to the termination of father's parental rights.

¶ 6 On appeal mother presents the following issues for review:

I. DID THE TRIAL COURT ERR IN FINDING THAT CYS PRESENTED CLEAR AND CONVINCING EVIDENCE TO SUPPORT A TERMINATION OF M.P.'S PARENTAL RIGHTS?

II. DID THE TRIAL COURT ERR IN TERMINATING THE PARENTAL RIGHTS OF M.P. WHEN THERE WAS UNDISPUTED EVIDENCE THAT A PROGRAM NECESSARY FOR REUNIFICATION WITH THE MINOR CHILD WAS NOT OFFERED TO M.P.?

Appellant's brief, at 3.

█ ¶ 7 Before addressing the substantive merits we must first determine whether this appeal was timely filed.[2] Pa.R.A.P. 903(a) requires the notice of appeal "be filed within thirty (30) days after the entry of the order from which the appeal is taken." The record reveals that the trial court entered an adjudication and decree *nisi* terminating the parental rights of the natural parents on February 21, 2001. Exceptions were then filed and decided by order dated April 3, 2001, and a final decree terminating the parental rights of the natural parents was entered on April 4, 2001. Mother filed her notice of appeal from the April 4th decree on May 2, 2001. Prior to January 1, 2001, this was the proper post trial procedure to follow, and the appeal period began to run as of the entry of the final decree. *See In re J.J.F.,* 729 A.2d 79 (Pa.Super.1999) (holding that unless local procedure dictates otherwise, exceptions are required in an action to terminate parental rights).

---

**2.** We note that although this Court's jurisdiction was not challenged by any of the parties, we may raise this issue *sua sponte. Rieser v.*

█ ¶ 8 However, on December 20, 2000, the Orphans' Court Rules were amended to eliminate post trial practice in involuntary termination and adoption matters, and this amendment became effective January 1, 2001. Specifically, Rule 7.1 now provides:

**(e) Adoptions and Involuntary Terminations.**

No exceptions shall be filed to any order in involuntary termination or adoption matters under the Adoption Act, 23 Pa. S.C. Section 2501, *et seq.*

In our *en banc* decision in the case of *In re A.L.,* 719 A.2d 363 (Pa.Super.1998), we determined that in Philadelphia County involuntary termination decrees and adoption decrees were immediately appealable. Therein we further opined:

Not only do we conclude that procedurally, post-trial practice does not apply to termination and adoption matters in Philadelphia, we believe that the time sensitive nature of these proceedings warrants the elimination of post-trial practice. Such a practice often extends the process to the detriment of the child, natural parents, and prospective adoptive parents. While our ruling does not apply to termination and adoption matters in any other judicial district of Pennsylvania, we call upon the Orphans' Court Rules Committee to consider mandating the elimination of any form of post-trial practice that delays final determination of these issues, and to provide for a uniform process throughout the state.

*Id.* at 364. It is apparent that the amendment of Rule 7.1 is the Rules Committee's answer to our call for streamlining and

*Glukowsky,* 435 Pa.Super. 530, 646 A.2d 1221, 1223 (1994).

uniformity. Accordingly, a strict application of Rule 7.1(e) would make this appeal untimely, as the entry of the "decree *nisi*" on February 21, 2001 constitutes an immediately appealable order and begins the running of the thirty-day clock.

¶ 9 However, given the unexplained delay of almost 20 months between the hearing of July 6, 1999 and the trial court's decision of February 21, 2001, the parties and the trial court may have reasonably concluded that the prior procedure, as articulated by *In re J.J.F., supra,* was still applicable. Moreover, we will not penalize Appellant for being misled by the trial court's indication in its Decree *Nisi* that exceptions were not only permissible but also necessary to preserve issues for review.[3] The procedural confusion occasioned by the delay and subsequent amendment placed Appellant on the horns of a dilemma about whether an immediate appeal or post-trial motion should be filed.

¶ 10 In *Burkhart v. Brockway Glass Co.,* 352 Pa.Super. 204, 507 A.2d 844 (1986), *appeal denied,* 514 Pa. 615, 521 A.2d 930 (1987), under a somewhat similar procedural quagmire this Court refused to strictly apply Pa.R.A.P. 903(a). In *Burkhart,* the appellant pursuant to local county rules filed exceptions, which were decided *en banc* following the trial court's grant of summary judgment. As a result, the appellant did not file an appeal with this Court until well after the thirty-day period had expired. In deciding to consider the merits, while we recognized that the Pennsylvania Rules of Civil Procedure did not provide for the filing of exceptions, we noted that "[i]t would, of course, be callously unjust to penalize a litigant because her counsel complied with a rule of the

forum." *Id.* at 846. Similarly, in the interest of justice we find that the amended Rule 7.1(e) should not be applied to termination proceedings that were still ongoing at the time when the new Rule became effective. However, we further note that this Rule will be strictly applied in all future cases where the hearing on the termination petition began after January 1, 2001. Accordingly, we will now review the merits of the instant appeal.

■ ¶ 11 When reviewing a decree involuntarily terminating parental rights, we employ the following scope and standard of review:

> In appeals involving termination of parental rights, our scope of review is broad. We consider all the evidence as well as the hearing court's factual and legal determinations. Our standard of review, however, is limited to determining whether the decree of the hearing court is supported by competent evidence and whether the court gave adequate consideration to the effect of such a decree on the welfare of the children. However, if competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result.

*In re L.S.G.,* 767 A.2d 587, 590 (Pa.Super.2001) (quoting *In re N.C.,* 763 A.2d 913 (Pa.Super.2000) (citations omitted)). Moreover,

> [t]he termination of parental rights is governed by statute. Before permitting termination, the trial court must be satisfied that the petitioner has established the required statutory elements by clear and convincing evidence. Clear and convincing evidence is defined as testi-

---

**3.** *See* Decree Nisi, 2/21/01, at paragraph 3, stating "Upon praecipe to the Clerk of the Orphan's Court by either party, this Adjudication and Decree Nisi shall be entered as a

Final Decree **if no exceptions hereto are filed within ten (10) days. See Pa.R.C.P. 227.1, 227.4.**" (emphasis added).

mony that is so clear, direct, weighty and convincing that the trier of fact may come to a clear conclusion, without hesitance, of the truth of the precise facts in issue. Finally, "[p]ursuant to the express mandate of Section 2511(b), a court must give 'primary consideration to the [developmental, physical and emotional] needs and welfare of the child.'"

*In re J.E.*, 745 A.2d 1250 (Pa.Super.2000) (citations omitted).

¶ 12 Here, CYS filed the petition seeking to terminate mother's parental rights based upon 23 Pa.C.S.A. § 2511(a)(5), which provides:

**2511. Grounds for involuntary termination**

(a) **General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

■ ¶ 13 Mother's first issue is essentially a sufficiency of the evidence question. She argues that CYS failed to meet its burden in proving the conditions which led to the child's original placement continued to exist and that mother could not or would not remedy the conditions that led

to placement within a reasonable time. She asserts the record is devoid of any testimony concerning any current or ongoing domestic violence or any drug or alcohol use within her home. Further, mother contends the record shows she has met the recommendations of CYS and took affirmative steps to remedy the situation that led to placement.

¶ 14 CYS removed the child in this case in response to safety concerns due to the abusive relationship between mother and father, which is acerbated by their drug and alcohol abuse. Specifically, the child was initially removed from mother's home in December of 1996 when she was arrested for endangering the welfare of the child, recklessly endangering another person and harassment. Since the time of the child's removal, mother has undergone several evaluations regarding drug and alcohol abuse, domestic violence and mental health issues but never followed through with a complete course of therapy for any of these issues. Moreover, during several evaluations, mother indicated she had no problems and was not, therefore, open to services at the local mental health clinic. CYS also presented evidence that it has ongoing concerns with mother's drug and alcohol problems, the ongoing domestic violence and the unstable, volatile relationship between her and the natural father. Mother has not attempted to distance herself from the natural father and at the time of the hearing was still living with him.

¶ 15 The record discloses that from April 1997 until August 1998 there were a total of fourteen (14) months during which mother had no contact with her child. During the 31 months from C.G.'s initial placement until the hearing on July 6, 1999, mother had moved to at least ten (10) different residences. She frequently did not have a telephone at her residence.

Moreover, even when she could be contacted she would not allow CYS access to the residence to evaluate its propriety as a potential home for C.G. Further, C.G. continues to be diagnosed with severe ADHD and prior evaluations identified undiagnosed problems as possible Fetal Alcohol Syndrome and possible Post–Traumatic Stress Disorder. Due to the complexity of these problems, C.G. requires an extraordinary amount of stability, structure and consistency. During the entire time C.G. has been in foster care, a period of five years, mother's contact with her child has not progressed beyond two-hour supervised visitations. The record reflects that mother has only made minimal efforts to acquire the necessary skills to properly parent a child with special needs. Additionally, psychologist William G. Allenbaugh offered a poor prognosis for mother, due in large part to her inability to accept the fact that she needs to work on the issues identified by the evaluations.

¶ 16 Our Supreme Court in *In re Burns,* 474 Pa. 615, 624, 379 A.2d 535, 540 (1977), stated:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

As further noted by this Court in *In Re Diaz,* 447 Pa.Super. 327, 669 A.2d 372, 377 (1995):

> ...when a child is placed in foster care, a parent has an affirmative duty to work toward the return of the child. Our Supreme Court further stated: '[w]e think this affirmative duty, at a minimum, requires a showing by the

parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities.' (internal citations omitted.)

¶ 17 Here, after careful review, we find the record clearly supports the trial court's conclusion that the conditions which led to the child's original placement continued to exist. This evidence is equally indicative of the fact and that mother has not made any significant progress within a reasonable time in remedying any of the identified problem areas which led to the placement of her child in foster care.

¶ 18 In a related argument mother contends that a program necessary for reunification was not offered to her. Specifically, she notes that the foster parents were given training to gain the skills necessary to care for a child with C.G.'s special needs; but she was not even made aware of the program, thus inhibiting her ability to regain custody of her child. We disagree.

■ ¶ 19 CYS concedes that it did not offer mother any specialized training in dealing with C.G.'s special needs. However, termination of her parental rights was not based upon whether or not she was amenable to or participated in this specialized training. The crux of mother's problem was her inability to provide even the basic needs of a structured environment and stable home life. These basic needs were a prerequisite for the return of C.G. to mother's care. CYS made it quite clear that had mother shown the ability or desire to acquire the skills necessary to provide for this child's basic needs and otherwise remedied the conditions that led to removal, these very same specialized support and training skills were available and would have been provided. We therefore find no merit to this contention.

¶ 20 In conclusion, we reject the arguments presented by mother and conclude that CYS has sustained its burden of proving by clear and convincing evidence the statutory grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5).

¶ 21 Decree affirmed.