J-A34031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE A.K.S. AND A.L.S., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF A.W., MOTHER | |
| | Nos: 1108 MDA 2014, 1109 MDA 2014, 1173 MDA 2014, 1174 MDA 2014 |

Appeal from the Orders Entered June 6, 2014
In the Court of Common Pleas of York County
Juvenile Division at Nos: CP-67-DP-0000082-2010 and CP-67-DP-0000004-2011, and the Decrees Entered June 6, 2014 In the Court of Common Pleas of York County Orphans' Court at Nos: 2013-0005 and 2013-0007

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                **FILED FEBRUARY 24, 2015**

Appellant, A.W. ("Mother"), appeals from the June 6, 2014 orders changing the goal for minor children A.K.S. and A.L.S. (the "Children") from reunification to adoption, and the June 6, 2014 decrees terminating Mother's parental rights to the Children.[1]  We affirm.

The trial court's Pa.R.A.P. 1925(a) opinion sets forth the pertinent facts and procedural history:

> The York County Office of Children, Youth, and Families (hereafter the "Agency") received an initial referral regarding the

---

[1]  The four consolidated docket numbers correspond to one goal change order and one termination order for each child.

minor Children […], on August 13, 2010 for a lack of supervision on the part of the Children's Mother. Protective services were offered, but despite the withdrawal of the dependency Petition, such services failed. On January 4, 2011, legal and physical custody of the Children were given to the paternal Grandparents by Court Order. A hearing was held on February 7, 2011 which reaffirmed that order. Unfortunately, the Agency was forced to file a dependency Petition on February 23, 2011, as the Grandparents were not supervising the Children. The Children were adjudicated dependent on March 3, 2011. However, physical custody remained with the Grandparents. By March 16, 2011, the Children were placed in foster care as a result of concerns regarding the appropriateness of care in the Grandparents' home. At that time, both parents were living with paternal grandparents.

Multiple family service plans were put into effect starting October 7, 2010 and continuing through April 1, 2013. All plans, with the exception of the April 1, 2013 plan, were reviewed by the Court for the parent's degree and level of compliance. The record is supported by Exhibits "A" through "G", and Exhibit "P" regarding Mother's compliance. We note that this Court has not reviewed Father's compliance with the family service plans, as his parental rights were previously terminated.

The family service plans of April 2011 and November 2011 revealed substantial compliance by Mother. These were the only two occasions in the thirty-eight months that these Children have been dependent that Mother was compliant to any degree. All prior plans reflected minimal compliance or effort by Mother to achieve the goals set for her. Mother was never in jail, probation or parole, in the United States armed services, in any rehabilitation recovery program, or engaged in any other capacity which would, up until the time of filing the instant Petition to Terminate Parental Rights and Change of Goal, interfere with her ability to work towards her goals.

Mother participated in a psychiatric evaluation by Doctor Mark Famador and a neuropsychological evaluation by Doctor David Nicodemus. Mother expended limited energy in dealing with her psychological needs and was sporadic in taking her medication. Three teams were assigned to work with Mother to aid and assist her, the first being Pressley Ridge, which closed unsuccessfully after only two months; Catholic Charities, which

closed unsuccessfully after three months; and, lastly, the Justice Works team. They worked with Mother from April 2011 until January 2013, at which time they closed unsuccessfully.

Mother was partially successful in obtaining housing. However, by the count of this Court, Mother has had nine different addresses from August 2010 to the present. Mother's last address was 427 W. Market Street, York, Pennsylvania, which was Section 8 housing and from which Mother was evicted as a result of Father's criminal activities on the premises. While Mother was ultimately successful in her appeal and now again has obtained Section 8 housing, it was Mother's poor choices which cost her the home.

The Agency filed a Petition to Change of Goal [sic] and to Terminate Mother's parental rights in January 2013. The matter was tried on August 9, 2013 and the goal was changed from reunification to adoption, and Mother's parental rights were terminated. Mother had asked the Court to appoint her new counsel prior to the hearing. When we declined to do so, Mother asked to represent herself, which we permitted. Mother appealed, counsel was reappointed after the Superior Court reversed and remanded on the issue of counsel with instructions that this case was to be retried within forty-five days. At the time of the first hearing, the Children had been in care for twenty-nine months. On May 30, 2014, a second hearing was held pursuant to the Superior Court's mandate. Rather than litigating the relationship between counsel and Mother, this Court appointed a substitute counsel. Mother confirmed to the Court at the time of the hearing that she was satisfied with her new counsel and wished to proceed.

Trial Court Opinion, 6/3/14, at 1-4.

After the May 30, 2014 hearing, the trial court took the matter under advisement and issued the orders on appeal on June 6, 2014. On appeal, Mother argues the trial court erred in terminating her parental rights and in changing the goal for each child from reunification to adoption.

- 3 -

The following standard governs our review of the decrees terminating Mother's parental rights:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of S.P.*, 47 A.3d 817, 821 (Pa. 2012). "The burden is upon the petitioning person or agency to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In the Interest of T.M.T.*, 64 A.3d 1119, 1124 (Pa. Super. 2013). "Moreover, we have explained: The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*

We review the goal change orders as follows:

> An order granting a goal change pursuant to the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, is final and appealable. Our standard of review in such cases is abuse of discretion. When reviewing such a decision we are bound by the facts as found by the trial court unless they are not supported in the record. Furthermore, in a change of goal proceeding, the trial court must focus on the child and determine the goal in accordance with the child's best interests and not those of his or her parents.

***In the Interest of C.J.R.***, 782 A.2d 568, 569 (Pa. Super. 2001) (citations omitted).

We have reviewed the parties' briefs, the trial court's opinion, the applicable law, and the certified record. We concluded that the trial court's thorough and well-reasoned opinion June 3, 2014 opinion adequately addressees Appellant's arguments. We therefore affirm the trial court's decrees for the reasons explained in that opinion. We direct that a copy of the trial court's June 3, 2014 opinion be attached to any future filings in this case.

Orders and Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/24/2015

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

In Re:

 ,

A Minor

No. 2013-0007
CP-67-DP-00082-2010

Orphan's Court Division

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In Re:

 ,

A Minor

No. 2013-0005
CP-67-DP-00004-2011

Orphan's Court Division.

## MEMORANDUM OPINION

## BACKGROUND OF THE CASE

The York County Office of Children, Youth, and Families (hereafter the "Agency") received an initial referral regarding the minor Children ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (hereafter the "Children"), on August 13, 2010 for a lack of supervision on the part of the Children's Mother. Protective service were offered but, despite the withdrawal of the dependency Petition, such services failed On January 4, 2011, legal and physical custody of the Children were given to the paternal Grandparents by Court Order. A hearing was held on February 7, 2011 which reaffirmed that Order.

1

Unfortunately, the Agency was forced to file a dependency Petition on February 23, 2011, as the Grandparents were not supervising the Children. The Children were adjudicated dependent on March 3, 2011. However, physical custody remained with the Grandparents. By March 16, 2011, the Children were placed in foster care as a result of concerns regarding the appropriateness of care in the Grandparent's home. At that time, both parents were living with paternal grandparents.

Multiple family service plans were put into effect starting October 7, 2011 and continuing through April 1, 2013. All plans, with the exception of the April 1, 2013 plan, were reviewed by the Court for the parent's degree and level of compliance. The record is supported by Exhibits "A" through "G", and Exhibit "P" regarding Mother's compliance. We note that this Court has not reviewed Father's compliance with the family service plans, as his parental rights were previously terminated

The family service plans of April 2011 and November 2011 revealed substantial compliance by Mother. These were the only two occasions in the thirty-eight months that these Children have been dependent that Mother was compliant to any degree. All prior plans reflected minimal compliance or effort by Mother to achieve the goals set for her. Mother was never in jail, probation or parole, in the United States armed services, in any rehabilitation recovery program, or engaged in any other capacity which would, up until the time of filing the instant Petition to

2

Terminate Parental Rights and Change of Goal, interfere with her ability to work towards her goals.

Mother participated in a psychiatric evaluation by Doctor Mark Famador and a neuropsychological evaluation by Doctor David Nicodemus. Mother expended limited energy in dealing with her psychological needs and was sporadic in taking her medication. Three teams were assigned to work with Mother to aid and assist her, the first being Pressley Ridge, which closed unsuccessfully after only two months; Catholic Charities, which closed unsuccessfully after three months; and, lastly, the Justice Works team. They worked with Mother from April 2011 until January 2013, at which time they closed unsuccessfully.

Mother was partially successful in obtaining housing. However, by the court of this Court, Mother has had nine different addresses from August 2010 to the present. Mother's last address was 427 W. Market Street, York, Pennsylvania, which was Section 8 housing and from which Mother was evicted as a result of Father's criminal activities on the premises. While Mother was ultimately successful in her appeal and now again has obtained Section 8 housing, it was Mother's poor choices which cost her the home.

The Agency filed a Petition to Change of Goal and to Terminate Mother's parental rights in January 2013. The matter was tried on August 9, 2013 and the goal was changed from reunification to adoption, and Mother's parental rights were terminated. Mother had asked the Court to appoint her new counsel prior to the

3

hearing. When we declined to do so. Mother asked to represent herself, which we permitted. Mother appealed, counsel was reappointed after the Superior Court reversed and remanded on the issue of counsel with instructions that this case was to be retried within forty-five days. At the time of the first hearing, the Children had been in care for twenty-nine months. On May 30, 2004, a second hearing was held pursuant to the Superior Court's mandate. Rather than litigating the relationship between counsel and Mother, this Court appointed a substitute counsel. Mother confirmed to the Court at the time of the hearing that she was satisfied with her new counsel and wished to proceed. Testimony and exhibits were taken and this Court's Opinion follows.

## DISCUSSION

1. Petition To Change The Court Ordered Goal.

Before the Court can change the goal for a child in a juvenile dependency action, CYS must prove by clear and convincing evidence that the change of goal would be in the child's best interest. *In the Interest of M.B.*, 674 A.2d 702, 704 (Pa. Super. Ct. 1996). In addition to the factors outlined in the Juvenile Act, any and all other factors that bear upon the welfare of the child must be taken into consideration. *In re Davis*, 465 A.2d 614 620 (Pa. 1983).

The purpose of the Juvenile Act is to preserve family unity—or provide an alternative family when required—and to "provide for the care, protection, safety and

4

wholesome mental and physical development" of the child. 42 Pa.C.S. § 6301(b)(1)-(1.1). The Juvenile Act was not intended to place children in a more perfect home; instead, the Act gives the Court the authority to "intervene to ensure that parents meet certain legislatively determined *irreducible minimum standards* in executing their parental rights." *In re J.W.*, 578 A.2d 952, 958 (Pa. Super. Ct. 1990) (emphasis added).

Because the Juvenile Act addresses the concerns of both child and parent, the Act is drawn broadly and must therefore be construed liberally upon interpretation. *In the Matter of T.R.*, 665 A.2d 1260, 1264 (Pa. Super. Ct. 1995), *reversed on other grounds*, 731 A.2d 1276 (Pa. 1999).

Pursuant to the Juvenile Act, the Court must make a determination as to each of the following factors:

(1) The continuing necessity for and appropriateness of the placement

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

5

(6) Whether the child is safe.

42 Pa.C.S. § 6351(f)(1) – (6).

Based on our considerations of these factors, the Court must then decide what disposition would be best suited to protect the physical, mental and moral welfare of the child. *Id.* § 6351(g). Specifically, the Court must determine:

> (a) If and when the child will be returned to the child's parent, guardian or custodian; or
>
> (b) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights.

*42 Pa.C.S.* § 6351(f.1).

The present goal of the family service plan is reunification of the Children with Mother. CYS is seeking to change the current goal of termination of parental rights and placement for adoption pursuant to the Juvenile Act. 42 Pa.C.S. § 6301 *et seq.*

A. Continuing Necessity For and Appropriateness Of Placement.

In this case, continued placement is necessary due to Mother's failure to meet any of the goals set forth by the Agency for Mother and approved by the Court without objection by Mother.

Mother has done little on her own to achieve the goals which were set by the Agency. Whether it is mental health issues or just plain orneriness, Mother does not work well with others. As we indicated, the first two teams put in place for Mother, while initially successful, were ultimately closed unsuccessfully as set forth in the closing summaries of those teams in Exhibits "J" and "K". While it is true that Mother

6

worked well with Justice Works, this was because she was accepting of them being her transportation to attend her appointments, to look for work, to apply for Social Security disability, and any other service that the team could provide for her. What Mother was incapable of doing was attaching with her Children, bonding with them, and playing any parental role in their lives.

B. Appropriateness, Feasibility, And Extent Of Compliance With Permanency Plan.

There was ample testimony at the time of the hearing as to Mother's opportunity to visit with her Children and her failures to do so. In 2012, Mother had an opportunity to visit the Children three times a week – twice at the Agency and once at home over the weekend. Those visits started in February 2012. Mother only exercised 47 out of over more than 150 opportunities to visit with the Children. Mother has never had unsupervised visits. By accounts of all witnesses, except for Grandfather, Mother displays little interaction with her Children, with the Agency fundamentally babysitting while Mother was on her cell phone. It became such a bone of contention that this Court had to order Mother to surrender her cellular phone when she was with her Children. This observation was shared by Doctor Nicodemus who indicated that, throughout his neuropsychological examination, Mother continually looked at her cell phone and kept it in view on her lap. The Guardian Ad Litem, Attorney Brooke Popper, perhaps tongue-in-cheek, suggested

7

that we should tie cell phones around the Children, so that Mother would engage with them.

There was never any engagement whatsoever between Mother and the younger Child, who was placed in foster care shortly after her birth. There was little engagement between the Mother and the older Child, although the older Child was not afraid of Mother and would approach her. Early Intervention and Early Head Start became involved with the Children in Mother's home during these visitations time periods in an effort to get Mother involved with the Children. These efforts failed. All suggestions made to Mother were never implemented, and it was apparent that Mother did not understand them.

The Agency further had a great deal of concern about Mother's ability to provide safety for the youngest Child, who suffered from a peanut allergy. It was fundamentally left to the Agency to check all foods, as Mother was not adequately protecting the Child when visits occurred. When asked at the hearing if Mother was ready for the Children at the present time, she answered "if God told her to take the kids she would." Short of divine intervention, this Court does not believe Mother is capable of providing for the Children, even after thirty-nine months. We should note that Mother last saw both Children in July 2013. However, Mother only visited the Children sporadically in 2013, having had eleven visits during a six-and-a-half month period of time.

8

## C. Extent Of Progress Toward Alleviating The Circumstances Which Necessitated Original Placement.

As we have indicated, Mother has made little progress towards alleviating the conditions that resulted in the placement. While Mother now has housing through Section 8 and is employed part-time, she continues to not deal with her emotional issues. By testimony, Mother indicated that she has not seen her counselor in over a year since the birth of her third child in May 2013, nor has she taken any of her medication since November 2012. Mother's mental health issues continue to be obvious as she displays persistent, inappropriate giggling and laughing during the proceedings, talking out loud and interrupting despite the Court's warnings. In effect, Mother has no appreciation that she suffers from any mental health issues.

## D. Appropriateness and Feasibility Of The Current Placement Goal.

The current placement goal is reunification. Reunification does not appear to be feasible at this time. Father's rights have previously been terminated while Mother claimed that she wishes to be reunited with the Children.

While Mother says she is ready, we believe that Mother's actions demonstrate otherwise. Mother continues to suffer from this Court's greatest concern – Mother's lack of supervision of the Children. As we have indicated, Mother has been inconsistent with her visitation with the Children to the extent that the youngest Child quite honestly does not know who she is visiting. While the oldest Child calls Mother "mommy," she also calls her foster mother her "mommy." Testimony

9

indicated that neither Child has a parent-child bond with Mother, whereas the Children have a strong bonding relationship with the foster mother, the preadoptive resource.

E. Likely Date By Which The Goal Might Be Achieved

After thirty-nine months, Mother's minimal progress is offset to a great degree by the relationship that the Children do not have with her and do have with the foster mother. Mother's own witness, the paternal Grandfather, testified that he did not believe Mother was in a position at the time of the hearing to be able to resume custody without mental health help from the Agency. Coupled with that, Mother made a statement during trial that she would not work with anybody, since she had done so much without success, that she did not see the point in trying again, that she simply waits for God to restore the relationship with the Children, and takes no steps on her own to achieve this goal.

F. Whether Reasonable Efforts Were Made To Finalize The Permanency Plan In Effect.

This Court believes that Mother made no reasonable efforts to finalize the permanency plan in place. As we indicated, despite the vast opportunities to visit with her Children during the period of placement, Mother had minimal visitations in 2012, lessening visits in 2013, and none in the past year. She has, by her own testimony, indicated that she is not working on any mental health issues as accorded to her by her mental health physicians. Mother indicated that, when Mother's doctors

10

realized they had talked about everything there was to talk about it, they indicated that she should come back to see them if she had any other matters to discuss. We simply do not believe Mother that her doctors indicated this to her. On the other hand, the Agency deployed reasonable efforts to achieve the goals, without success, by Mother.

### G. Whether The Children Are Safe.

The Children are safe where they are presently living. For the reasons discussed above, we do not believe the Children would be safe with Mother.

### H. Analysis of Factors.

Based on all the above factors, especially the feasibility of reunification and the likely date of reunification, this Court believes it is appropriate to change the goal to adoption. Both Children are happy, healthy, loved, and safe in their current environment, none of which we believe would be the case if they were to be returned to Mother. It is clear that, after thirty-eight months, Mother is incapable of achieving the goal of reunification and that these Children are entitled to permanency, stability, and safety in their lives. We do not believe that Mother will be able to get herself together. In fact, we note that Mother has had her third child removed from her, a child having been born prior to the first change of goal and termination Order.

## II. Petition for Involuntary Termination Of Parental Rights.

11

CYS argues that Mother's parental rights to the Children should be terminated

pursuant to Section 2511, subsections (a)(1) or (a)(5) of the Adoption Act. These

subsections provide as follows:

> (a) General rule.--The rights of a parent in regard to a child may be
> terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six
> > months immediately preceding the filing of the petition either has
> > evidenced a settled purpose of relinquishing parental claim to a
> > child or has refused or failed to perform parental duties.
>
> > ***
>
> > (5) The child has been removed from the care of the parent by the
> > court or under a voluntary agreement with an agency for a period of
> > at least six months, the conditions which led to the removal or
> > placement of the child continue to exist, the parent cannot or will
> > not remedy those conditions within a reasonable period of time, the
> > services or assistance reasonably available to the parent are not
> > likely to remedy the conditions which led to the removal or
> > placement of the child within a reasonable period of time and
> > termination of the parental rights would best serve the needs and
> > welfare of the child.

23 Pa.C.S. § 2511 (a)(1), (5).

CYS has the burden of establishing by clear and convincing evidence that

statutory grounds exist to justify the involuntary termination of parental rights. *In re*

*Child M.*, 681 A.2d 793, 797 (Pa. Super. Ct. 1996). The clear and convincing

standard means that the evidence presented by CYS is so "clear, direct weighty

and convincing that one can come to clear conviction, without hesitancy, of the truth

12

of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203-1204 (Pa 1989).

CYS must also present evidence proving that the termination of the parental rights will serve the Children's needs and welfare. *In the Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 92-93 (Pa. 1998). Further, Section 2511, subsection (b) of the Adoption Act provides:

> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

CYS has proven by clear and convincing evidence that the parental rights of a parent should be involuntarily terminated pursuant to 23 Pa. C S. § 2511(a)(5) and (a)(8).

The most critical part of the Court's analysis of the six months immediately preceding the filing of the petition. *In re D.J.S.*, 737 A.2d 283, 286 (Pa Super. Ct 1999), (*citing In re A.P.*, 692 A.2d 240 (Pa. Super. Ct. 1997)). However, the Court 'must consider the whole history of a given case and not mechanically apply the six-

13

month statutory provisions, but instead consider the individual circumstances of each case." *Id.* (citation omitted). Furthermore, the Superior Court has stated:

> To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on his question. *Id.* (*quoting In re Hamilton.* 549 A.2d 1291, 1295 (Pa. Super. Ct 1988)).

### A. § 2511(a)(5) Analysis

The Agency contends that this Court should involuntarily terminate Mother's parental rights under subsection (a)(5) of Section 2511 of the Adoption Act. To satisfy the statutory provision the Agency must prove by clear and convincing evidence that several conditions exist. First. the Children must have been removed from parental care by court order or Agency agreement for at least six months before the filing of the petition to terminate parental rights. Second, the conditions that led to the removal must continue to exist. Third, Mother must not be able or willing to remedy those conditions within a reasonable period of time. Forth. the services or assistance reasonably available to the parent must not be likely to remedy the conditions that led to the removal within a reasonable period of time. Fifth, termination of parental might rights must best serve the needs and welfare of the child. *See In re C.G.,* 791 A.2d 430, 435-36 (Pa. Super. Ct. 2002).

14

In this case, the oldest Child has been removed from Mother's care when she was eighteen months old and the youngest child since she was one month old. The conditions that led to this removal still exist. Mother has taken only minor steps to reunify and continues to not have the capacity to care for the girls at the present time.

The conditions are not likely to be remedied within a reasonable period of time. Of great concern is Mother's statement that she would no longer work with anybody at the Agency if the Children were to be returned to her and Mother's utter refusal to deal with her mental health issues. There is no indication as to how long it will take for Mother to get her life in order. However, since Mother is not working on any goals, the answer is likely 'never.' Consequently, it does not appear that Mother is ready to parent her Children.

Finally, termination of parental rights will serve the needs and welfare of the Children. As indicated, the Children have been in foster care since April 2011 and have a bond with the foster family that they simply do not have to any extent with Mother. As we previously indicated, the youngest Child not only does not recognize Mother as a source of love and affection but will also not even go to Mother. This appears to be fine with Mother, since being with this Child would interfere with her texting. Children need some structure and finality in the familiar relationships. Since there is no bond between the Children and Mother, and there is a strong bond with the foster family, we believe that termination is appropriate.

15

B. § 2511(a)(1)

Because the Court finds that involuntary termination of parental rights is appropriate under section (a)(5), the Court will not undertake an analysis of termination pursuant to subsection (a)(1).

## CONCLUSIONS OF LAW

1. The current placement of the Children continues to be necessary and appropriate. 42 Pa.C.S. § 6351(f)(1).

2. Mother has not complied with family service plans. 42 Pa.C.S. § 6351(f)(2).

3. The circumstances that necessitated the Children's original placement continue to exist. 42 Pa.C.S. § 6351(f)(3).

4. The current placement goal of reunification of the Children with the Mother is no longer appropriate and feasible. 42 Pa.C.S. § 6351(f)(4).

5. CYS has made reasonable efforts to finalize the permanency plan that was in effect during the Children's placement 42 Pa.C.S. § 6351(f)(5.1)

6. The Children safe in their current placement setting. 42 Pa.C.S. § 6351(f)(6).

7. CYS has proven by clear and convincing evidence that the Children have been removed from the care of the Mother by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions that led to the removal or placement the Children continue to exist, the Mother cannot or will not remedy those conditions within a reasonable period of time,

16

the services or assistance readily available to the parents are not likely to remedy the conditions that led to the removal or placement of the Children within a reasonable period of time, and termination of parental rights would best serve the needs and welfare of the Children. 23 Pa.C.S. § 2511(a)(5).

8.  Termination of all parental rights of the Mother of the Children would best serve their development, physical, and emotional needs and welfare. 23 Pa.C.S. § 2511(b).

The following decree and order shall issue.

BY THE COURT:

Date: June 3, 2014

HARRY M. NESS, Judge

17