J-S52011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D.M., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W. | : | No. 647 MDA 2017 |

Appeal from the Order Entered March 22, 2017
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000022-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W. | : | No. 648 MDA 2017 |

Appeal from the Order Entered March 22, 2017
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000020-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W. | : | No. 649 MDA 2017 |

Appeal from the Order Entered March 22, 2017
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000021-2010

J-S52011-17

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.D.M., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W., MOTHER | : | No. 678 MDA 2017 |

Appeal from the Decree March 21, 2017
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0163a

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W., MOTHER | : | No. 679 MDA 2017 |

Appeal from the Decree March 21, 2017
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0164

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.D.M.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.M.W., MOTHER | : | No. 680 MDA 2017 |

Appeal from the Decree March 21, 2017
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0165a

BEFORE:  GANTMAN, P.J., LAZARUS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                    **FILED OCTOBER 18, 2017**

S.M.W. ("Mother") appeals from the Decrees granting the Petitions, filed by the York County Office of Children, Youth and Families ("CYF" or the "Agency"), to involuntarily terminate her parental rights to her son, C.D.M.,

- 2 -

Jr. ("Oldest Child") (born in July 2004); her daughter, C.D.M.M. ("Middle Child") (born in September 2005); and her son, C.D.M.M.2 ("Youngest Child") (born in December 2007) (collectively, "the Children"),[1] pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2]  Mother also appeals the related Orders that changed the Children's permanency goals from reunification to adoption, pursuant to 42 Pa.C.S.A. § 6351.  We affirm.

The trial court set forth the factual background of this appeal in its Adjudication and Order entered on March 21, 2017 (hereinafter "Trial Court Opinion").  **See** Trial Court Opinion, 3/21/17, at 1-8.  We incorporate the trial court's recitation as though fully set forth herein.  **See id.**

At the hearing on CYF's termination/goal change Petitions, held on February 24, 2017, each of the Children testified.  **See** N.T., 2/24/17, at 18-70.  Additionally, CYF presented four witnesses, including Chelsea Grove (hereinafter "Caseworker"), a placement caseworker at CYF, who had been the assigned Caseworker for the Children since June 2016.  **Id.** at 117-18.  Mother testified on her own behalf.  **Id.** at 208.

---

[1] The Children have another younger male half-sibling, Car.M., who resides with his father.  **See** N.T., 2/24/17, at 73, 91, 166, 224.  Neither Car.M. nor his father is a subject of the instant appeal.

[2] In separate Decrees entered on March 21, 2017, the trial court terminated the parental rights of the Children's father, C.D.M., Sr. ("Father"), and any unknown father to the Children.  Neither Father nor any unknown father has filed an appeal, nor is Father or any unknown father a party to the instant appeal.

On March 21, 2017, the trial court entered the Decrees terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). On the following day, the court entered the Orders changing the Children's permanency goals to adoption. Mother filed separate, timely Notices of Appeal, along with Concise Statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). In May 2017, this Court, *sua sponte*, consolidated the appeals.

Mother now presents the following issues for our review:

I. Whether the trial court abused its discretion and/or erred as a matter of law in changing the [] Children's permanency goals to adoption[,] when [Mother] asserts such was not in the best interest[s] of the Children?

II. Whether the trial court abused its discretion and/or erred as a matter of law in changing the permanency goal to adoption[,] and terminating the parental rights of [Mother,] when more time may permit [Mother] to remedy the conditions that caused removal and permit the Children and [Mother] to live once again as an intact family?

III. Whether the trial court abused its discretion and/or erred as a matter of law in terminating the parental rights of [Mother] when such was not in the best interests of the Children[,] where bonds do exist between [Mother] and the Children, the Children and one another, and there is no plan to place the three Children together?

IV. Whether the trial court abused its discretion and/or erred as a matter of law in terminating the parental rights of [Mother,] as [] Caseworker testified beyond her knowledge and/or expertise?

Mother's Brief at 5 (issues renumbered for ease of disposition).[3]

In her first issue, Mother argues that the trial court abused its discretion or erred as a matter of law in changing the Children's permanency goals to adoption. *See id.* at 10-12. Mother complains that the trial court failed to inquire "what, if any, efforts were made to locate a home for all three [] of the Children." *Id.* at 11. She further contends that

> the tentative "plan" for the Children is ultimately not in their best interests and welfare due to: their age; their bonds with [Mother]; their bonds with one another; and the fact that the Children have ultimately been separated not only from their only involved biological parent, but from one another as well. Additionally, within the last six [] months, Mother had been in a position to have the Children in her unsupervised care[,] and [she] was working toward reunification.

*Id.* at 12.

> [T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. We review for abuse of discretion[.]

*In Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citations and quotation marks omitted).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. *See* 42 Pa.C.S.A. § 6351.

---

[3] Mother stated her issues somewhat differently in her Concise Statements. We, nevertheless, find them sufficiently preserved for our review.

Pursuant to those subsections, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child. *See id.* § 6351(g).

When considering a petition for goal change for a dependent child, the trial court must consider:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citation omitted).

Additionally, section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> *   *   *
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S.A. § 6351(f.1)(2).

On the issue of a placement goal change, this Court has stated as follows:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. *See In re Sweeney*, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent … the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." *In re E.F.V.*, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006).

In its Opinion, the trial court thoroughly addressed Mother's issue, discussed the section 6351 criteria and the applicable law, and determined that changing the Children's placement goal to adoption was appropriate and in the Children's best interests. *See* Trial Court Opinion, 3/21/17, at 9-15, 26; *see also id.* at 24-25 (wherein the trial court addressed the matter of Middle Child's placement in a pre-adoptive home different from the pre-adoptive placement home of Oldest Child and Youngest Child, and the efforts needed to continue sibling contact). The trial court's findings are supported by the record, and we agree with its determination, discerning no abuse of discretion. *See In Interest of L.Z.*, 111 A.3d at 1174. Accordingly, we adopt the trial court's recitation as though fully set forth herein, and affirm

- 7 -

on this basis concerning Mother's first issue. *See* Trial Court Opinion, 3/21/17, at 9-15, 26.

In her second issue, Mother argues that the trial court abused its discretion in determining that termination of her parental rights to the Children was warranted, when more time might permit Mother to remedy the conditions that caused the Children's removal from her care, and permit the reunification of Mother and the Children. *See* Mother's Brief at 22-23.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, [] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d [567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, [] 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [] 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As [the Supreme Court] discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. [The Court] observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the

facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** (citation and quotation marks omitted).

This Court may affirm a trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with a consideration of section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In the instant case, we will focus on sections 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Concerning incapacity sufficient for termination under subsection 2511(a)(2), the Pennsylvania Supreme Court has stated as follows:

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827 (citation omitted).

Moreover,

[t]he biological relationship of parent and child does not vest in the parents a property right to the custody of the child. Instead, a parent-child relationship is a status, and one in which the state has an interest to protect the best interest of the child. Maintaining a parent-child relationship requires a continued

- 10 -

interest in the child and a genuine effort to maintain communication and association with the child.

A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise "reasonable firmness" in resisting obstacles placed in the path of maintaining the parent-child relationship. This [C]ourt has repeatedly recognized that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.

*In re Adoption of M.R.D.*, 128 A.3d 1249, 1261-62 (Pa. Super. 2015) (*en banc*) (citations, quotation marks and ellipses omitted); *see also In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (stating that a parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous).

In its Opinion, the trial court addressed Mother's second issue and determined that CYF had established, by clear and convincing evidence, that termination of Mother's parental rights to the Children was appropriate under subsection 2511(a)(2). *See* Trial Court Opinion, 3/21/17, at 20-21, 21-22. The trial court's findings are supported by the record, and we agree with its determination that (1) Mother lacks parental capacity; and (2) the evidence showed that she will be unable to remedy that situation within a reasonable period of time, if ever. Accordingly, we adopt the trial court's recitation as though fully set forth herein, *see id.*, and affirm on this basis as to Mother's second issue, with the following addendum.

- 11 -

Concerning Mother's claim that she could remedy the conditions that led to the Children's placement if afforded more time, this Court has stated that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d 999, 1007 (Pa. Super. 2008) (*en banc*) (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")). Moreover, "a parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

In her third issue, Mother challenges the trial court's determination that CYF had established, by clear and convincing evidence, that termination of her parental rights was in the Children's best interests under section 2511(b), particularly where (1) strong bonds exist between her and the Children, and amongst the Children; and (2) there is no plan to place the three Children together. *See* Mother's Brief at 13-16.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d at 1008. In

reviewing the evidence in support of termination under section 2511(b), our

Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the trial court thoroughly addressed its consideration of section

2511(b) in its Opinion. *See* Trial Court Opinion, 3/21/17, at 22-25. As the

court's analysis is sound and supported by the record, we adopt it herein by

reference. *See id.* We additionally note the following.

Our Supreme Court has stated that the mere existence of a bond or

attachment of a child to a parent will not necessarily result in the denial of a

termination petition, and that "[e]ven the most abused of children will often

harbor some positive emotion towards the abusive parent." *In re: T.S.M.*,

71 A.3d at 267 (citation omitted). Additionally, "[t]he continued attachment

to the natural parents, despite serious parental rejection through abuse and

neglect, and failure to correct parenting and behavior disorders which are

harming the children[,] cannot be misconstrued as bonding." *Id.* (citation omitted).

Moreover, the trial court appropriately considered the fact that Oldest Child and Youngest Child would be living together in the same pre-adoptive foster home after the hearing, with R.C. and K.C. as their foster parents. The trial court also considered that Middle Child was in a separate foster home, with K.S. and her husband, S.S., as the foster parents. Caseworker testified that she had spoken with both foster families on numerous occasions concerning the Children's separation, and the foster parents had assured Caseworker that they would ensure that the Children have visitation and the ability to call each other. *See* N.T., 2/24/17, at 167. Similarly, the Children's Guardian *Ad Litem* ("the GAL") questioned Caseworker about the arrangements for the Children to visit with each other and Car.M. *Id.* at 169-71. The GAL opined that a meeting between both sets of pre-adoptive foster parents would be appropriate to address the matter of continuing sibling contact. *Id.* at 206. At the close of the hearing, the trial court directed CYF and the GAL to meet with the foster parents and the father of Car.M., in order to devise a plan to maintain sibling contact. *Id.* at 246. The court ordered that the Children shall spend a minimum of two hours per week together, and that CYF must attempt to involve Car.M. as well. *Id.* at 246-47. Further, the trial court ordered that the Children shall conduct at least one conference phone call per week, in addition to the two-hour visit.

*Id.* at 247. Accordingly, contrary to Mother's claim, the trial court, in fact, appropriately considered the bond between the Children and the importance of maintaining that bond.

In her related fourth issue, Mother asserts that the testimony of Caseworker was beyond her knowledge/expertise. *See* Mother's Brief at 16-22. According to Mother, "in considering and utilizing [] Caseworker's overall testimony, the trial court abused its discretion and/or erred as a matter of law in terminating [] Mother's[] parental rights." *Id.* at 21-22. We disagree.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances … where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008). Moreover, it is appropriate to consider a child's bond with his or her foster parent(s). *See In re T.S.M.*, 71 A.3d at 268.

We discern no abuse of the trial court's discretion in finding that the requirements of section 2511(b) were met by clear and convincing evidence,

and the record supports its findings and credibility determinations. ***See*** Trial Court Opinion, 3/21/17, at 22-25; ***see also In re K.Z.S.***, 946 A.2d at 763-64 (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years). Accordingly, Mother's fourth issue does not entitle her to relief.

Based upon the foregoing, we affirm the Decrees terminating Mother's parental rights under section 2511(a)(1) and (b), and the Orders changing the Children's permanency goals to adoption.[4]

Decrees and Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/18/2017

_____

[4] The parties are hereby directed to attach to this Memorandum a copy of the Trial Court Opinion, in the event of further proceedings.

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA

In the Interest Of:

| | | |
|---|---|---|
| C. D. M. , Jr., | : | No. CP-67-DP-22-2010 |
| C. D. A. I. | : | No. CP-67-DP-21-2010 |
| C. D. M. M. | : | No. CP-67-DP-20-2010 |
| Minors | : | Change of Goal |

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In re: Adoption of:

| | | |
|---|---|---|
| C. D. M. , Jr., | : | No. 2016-0163 |
| C. D. M. M. | : | No. 2016-0164 |
| C. D. M. M. | : | No. 2016-0165 |
| Minors | : | Termination of Parental Rights |

Appearances:

MARTIN MILLER, Esquire
For York County Children, Youth and Families

CHRISTOPHER MOORE, Esquire
Guardian Ad Litem for the Minors

HEATHER REYNOSA, Esquire
For Mother, S. W.

Pro Se—Did Not Appear
Father, C. M. Sr.

## ADJUDICATION

For the reasons outlined in the Finding of Facts and Discussion below, the Court

GRANTS the Petitions filed by the York County Office of Children, Youth and Families.

## PROCEDURAL HISTORY

On December 12, 2016, the York County Office of Children, Youth and Families

(hereinafter "CYF" or "The Agency") filed a Petition to Change the Court-Ordered Goal

from reunification with a parent to termination of parental rights and placement for

adoption, and a Petition to Involuntarily Terminate The Parental Rights of the parents of the children, C___ D___ M____, Jr.; C___ D___ M___ M____ and C___ D___ M___ M____ (collectively referred to as the "Children"). A hearing was held on February 24, 2017.

## FINDINGS OF FACT

Before the Court are separate Petitions for each of three (3) children for a total of six (6) petitions filed by The Agency. One set of Petitions asks the Court to change the court-ordered goal of reunification with the parents to termination of parental rights and placement for adoption, and the other set requests the Court to involuntarily terminate the parental rights to the above-captioned Children.

1. The Court incorporates the prior findings of the Court from the orders in the juvenile records docketed at CP-67-DP-22-2010, CP-67-DP-21-2010, and CP-67-DP-20-2010 into these findings.

2. The natural mother of the minor children is S___ M___ W___ hereinafter "Mother"), whose current address is ___ West Maple Street, York, Pennsylvania 17401. The natural father of the minor children is C___ D___ M___, Sr. (hereinafter "Father"), whose current address is unknown but whose last address was Harrisburg Community Corrections Center, 27 North Cameron Street, Harrisburg, Pennsylvania 17101.

2

3. C___ D___ M___ Jr. was born on July _ 2004. C___ D___ M___ M___ was born on December _ 2007. C___ M___ M___ was born on September _, 2005.

4. The Agency has had extensive involvement with the Children since 2010 when the children previously came into placement; however, reunification was achieved with juvenile court supervision terminated in June of 2012.

5. On May 30, 2014, the agency filed an Application for Emergency Protective Custody, and upon a finding that continuation or return of the Children to the home of Mother and Father was not in the Children's best interests, the Children were placed in foster care. Legal and physical custody of the Children were awarded to the Agency.

6. On June 5, 2014, the Agency filed an Alleged Dependent Children Petition that alleged the following:

   a. Mother was using illegal drugs;

   b. Mother did not have adequate housing for the Children;

   c. The Children were living with the maternal grandparents at the time of the referral;

   d. The Children had issues with truancy;

   e. Mother had contacted the Agency and requested that the Children be placed in foster care because she was unable to maintain appropriate housing; and

3

f. Father was not an available resource due to his incarceration at SCI Coal Township.

7. On June 16, 2014, the Children were adjudicated dependent because Mother lacked adequate housing and resources for the Children and was using illegal substances. The Agency was awarded legal and physical custody of the Children. The Children were to remain in foster care. The goal initially established was return to a parent or guardian. The Children have remained dependent and in placement since June 16, 2014.

8. A total of six family service plans were prepared. Mother and Father had moderate and minimal compliance with the July 3, 2014 Plan, respectively. The Parents had moderate compliance with the October 29, 2014 Plan. Mother and Father had substantial to moderate and no compliance with the April 8, 2015 Plan, respectively. The Parents had no compliance with the September 11, 2015 Plan. Mother and Father had substantial and no compliance with the June 8, 2016 Plan, respectively.

9. Unfortunately, since their placement in May 2014, the Children have been in multiple homes, and they have not always been placed together.

C. D. M., Jr.

a. The placement for C ⎰ is as follows:

i. On May 29, 2014, C was placed in the foster home of L and V M

4

ii. On June 11, 2015, C̲ was placed in emergency caregiver placement with the maternal grandparents, J̲ and D̲ W̲.

iii. On June 7, 2016, C̲ was placed in the foster home of A̲ and R̲ C̲.

iv. On July 6, 2016, C̲ was placed in the Youth Development Center.

v. Finally, on July 21, 2016, C̲ was placed and has remained in the foster home of R̲ and K̲ C̲.

b. The placement for C̲ C.D.M.M.2 's as follows:

i. On May 29, 2014, C̲ was placed in the foster home of L̲ and V̲ M̲.

ii. On June 19, 2015, C̲ was placed in inpatient hospitalization at Kidspeace Psychiatric Hospital.

iii. On July 20, 2015, C̲ was placed in the foster home of A̲ C̲.

iv. On March 2, 2016, C̲ was placed in the respite foster home of R̲ W̲.

v. On March 11, 2016, C̲ was placed in the foster home of J̲ and W̲.

5

vi. On May 23, 2016, C    was placed in the foster home of C

and M    B    .

vii. On July 7, 2016, C    was placed in a Group Home at Hoffman

Homes.

viii. Finally, on March 7, 2017, C    was placed in the foster home of

R    and K    C    .

C.D.M.M.

c. The placement for C    is as follows:

i. On May 29, 2014, C    was placed in the foster home of L

and V    M

ii. On June 11, 2015, C    was placed in emergency caregiver

placement with the maternal grandparents, D    and Jr

W    .

iii. On June 7, 2016, C    was placed in the foster home of A

and R    O.

iv. On July 12, 2016, C    was placed in kinship placement with the

maternal grandparents, D    and J    W

v. On August 23, 2016, C    was placed in the foster home of R

and K    C    

vi. Finally, on December 30, 2016, C    was placed and has remained

in the foster home of K    S

6

10. At the time that the above-referenced petitions were filed, the Children's placements seem to have stabilized with a permanent placement likely for all of the Children.

11. Unfortunately, at the time of the hearing, all three of the Children were in separate placements. However, on March 7, 2017, C. was released to the foster home of R____ and K____ C____, where C. had been and is currently residing.

12. While there have been some issues with sibling visits, there is a plan in place for those visits to occur on a regular basis.

13. On December 12, 2016, the Agency filed a Petition to Change the Court-Ordered Goal from reunification with a parent to termination of parental rights and placement for adoption, and a Petition to Involuntarily Terminate The Parental Rights of the parents of the Children.

14. Notice of the Change of Goal/Involuntary Termination proceedings were served upon both S____ M____ W____ and C____ D____ M____ Sr. (collectively referred to as "Parents") by personal service on Mother on February 14, 2017 and by publication on Parents on December 27, 2016, January 3 and 10, 2017 in The Patriot News; on December 30, 2016, January 6, 13, and 20, 2017 in the Dauphin County Reporter; and December 26 and 29, 2016, January 1, 2, 5, 9 and 12, 2017 in the York Legal Record.

15. A hearing was held on February 24, 2017 to address the Petition to Change the Court-Ordered Goal and the petition to Terminate the Parental Rights to the

7

Children. Mother attended the hearing; Father did not. At the time of the hearing, the Children had been in Agency custody for more than twenty-eight (28) months, and sixty (60) months since the initial placement.

## DISCUSSION

### I. Petition to Change the Court-Ordered Goal

Before the Court can change the goal for any child in a juvenile dependency action, the Agency for Children, Youth, and Families ("CYF") must prove by clear and convincing evidence that the change of goal would be in the child's best interest. *In re Interest of M.B.*, 674 A.2d 702 (Pa.Super. 1996). In addition to the factors outlined in the Juvenile Act, any and all other factors that bear upon the welfare of the children must be taken into consideration. *In re Davis*, 465 A.2d 614, 620 (Pa. 1983).

The purpose of the Juvenile Act is to preserve family unity, or provide an alternative family when required, and to "provide for the care, protection, safety and wholesome mental and physical development" of the child. 42 Pa.C.S. §§ 6301(b)(1)-(1.1). the Juvenile Act was not intended to place children in a more perfect home; instead, the Act gives the Court the authority to "intervene to ensure that parents meet certain legislatively determined *irreducible minimum standards* in executing their parental rights." *In re J.W.*, 578 A.2d 952, 958 (Pa.Super. 1990)(*emphasis added*).

Because the Juvenile Act addresses the concerns of both child and parent, the Act is drawn broadly and must therefore be construed liberally upon interpretation. *In the Matter of T.R.*, 665 A.2d 1260, 1264 (Pa.Super. 1995)(*reversed on other grounds*).

8

Pursuant to the Juvenile Act, the Court must make a determination as to each of the following factors in reviewing the permanency plan for the child:

a. the continuing necessity for and appropriateness of the placement;
b. the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child;
c. the extent of the progress made toward alleviating the circumstances which necessitated the original placement;
d. the appropriateness and feasibility of the current placement goal for the child;
e. the likely date by which the goal for the child might be achieved;
f. whether reasonable efforts were made to finalize the permanency plan in effect; and
g. whether the child is safe.

42 Pa.C.S. §§ 6351(f)(1)-(6).

Based on the evidence presented and the determinations made pursuant to 42 Pa.C.S. § 6351(f), the Court must then decide what disposition would be best suited to protect the physical, mental, and moral welfare of the child. 42 Pa.C.S. § 6351(g). The Court must determine:

a. if and when the child should be returned to the parents, guardian or other custodian; or
b. if and when the child will be placed for adoption and the county agency will file for termination of parental rights.

42 Pa.C.S. §6351(f)(1).

The present goal of the family service plan is reunification of the Children with a parent. CYF is seeking to change the current goal to termination of parental rights and placement for adoption pursuant to the Juvenile Act. 42 Pa.C.S. § 6301 *et seq.*

A. Continuing Necessity for and Appropriateness of Placement

9

In this case, continued placement is necessary due to continuing issues with both Parents. Mother has an inability to obtain and maintain appropriate housing, she continues to have positive or missed drug tests, and she has failed to maintain consistent contact or visits. Father has failed to contact the children and/or participate in any proceedings for a few years.

This case actually has a 2010 docket number. With this round of services, the Children have been continuously in placement since May 30, 2014. Numerous services have been provided, especially to Mother, since the time the children came into placement. Mother had a Justice Works team from June 11, 2014 until September 3, 2014. The team closed unsuccessfully. (Joint Stipulation, 2/16/17, ¶27.) A Pressley Ridge Team worked with Mother from October 3, 2014 until November 4 2015. That team closed unsuccessfully. (Joint Stipulation, 2/16/17, ¶28.) Mother has continued to struggle with issues related to substance abuse and housing. She was moving in the right direction during her time at Life's Beacon in the summer of 2016, but her progress fell apart upon her unsuccessful discharge from the program. Mother then exacerbated her issues by failing to keep the Agency informed with regard to her whereabouts or maintaining visitation with the Children. Despite the services, she is not yet in a position to even have any substantial period of unsupervised contact. Therefore, placement continues to be necessary. The Court has reached the point where further services are only duplicative and not likely to result in reunification.

10

With regard to Father, his whereabouts are unknown. He has made no effort to remain engaged in any meaningful way. His last contact with the Agency was in 2015.

B. Appropriateness, Feasibility, and Extent of Compliance with the Permanency Plan

When children are placed in foster care, the parents have an affirmative duty to make the changes in their lives that would allow them to become appropriate parents. *In re Diaz*, 669 A.2d 372, 377 (Pa.Super. 1995). A family service plan is created to help give the parents some guideline as to the various guideline as to the various areas that need to be improved. *In the Interest of M.B.*, 565 A.2d 804, 806 (Pa.Super. 1989). By assessing the parents' compliance and success with this family service plan, the Court can determine if the parents have fulfilled their affirmative duty. *In re J.S.W.*, 651 A.2d 167, 170 (Pa.Super. 1994). When the parents fail to make efforts to comply with the family service plans, the Court is justified in changing the children's goals.

As for the current Plan, Mother's goals were to obtain and maintain stable employment, housing, and sobriety, and to work on her bond with the Children. Father's goals were to obtain and maintain stable employment and housing, and to work on his relationship with the Children. Each service team that was assigned to Mother has closed out unsuccessfully. Mother has not complied with the goal of obtaining and maintaining suitable housing, employment, or sobriety. Father has not complied with the Plan at all. What is most concerning for the Court recently is that Mother essentially dropped out of the picture. She indicated that she was having substantial issues with depression and that she was not really interacting with anyone. The Court hopes that she is able to address

11

these issues and make progress, but the Children need a parent who is actively working toward permanency.

C. Extent of Progress Toward Alleviating the Circumstances which Necessitated Original Placement

The original placement was necessitated by a lack of adequate housing and resources, and Mother's use of illegal substances. It appears that Parents have made no progress regarding these problems. From November 2015 to February 2016, Mother tested positive once for THC and was unable to provide a sample on three other occasions. Mother is currently staying at a one-room efficiency at a boarding house. Mother testified that she intends to live with her boyfriend, who has a criminal history of violent crimes, and whose tax return is expected to pay for the rent. Mother's choice to move in with her boyfriend puts her moving in the wrong direction in terms of appropriate housing for the Children. The Court cannot look favorably on the Children residing with someone with a history of violent crimes. Father stopped responding to the Agency's request for contact and his current whereabouts are unknown. Therefore, neither parent is making any progress toward alleviating the circumstances which necessitated the original placement.

D. Appropriateness and Feasibility of the Current Placement Goal

The current placement goal is reunification. Reunification does not appear to be feasible at this time. The Children have been in placement for more than twenty-eight (28) months. All three of the Children told the Court that they just want a normal life. The Children indicated that they would be alright with returning to live with Mother only if she

12

stopped using drugs. Given the similarity of the Children's initials, the Court will refer to them as the oldest, middle, and youngest child, in order to avoid the use of their names for public record. The youngest child told the Court that he does not want to live with Mother because he is "afraid she is going to get back on drugs and stuff." The oldest child told the Court that he does not want to live with Mother if she does not have suitable housing. The middle child indicated that she was used to not seeing or not talking to Mother. The Children either vaguely remember or do not remember Father at all. The bond between Parents and Children has dissipated in the twenty-eight months that the Children have been in foster care. Part of their lack of affection may stem from the Children's interactions with their foster parents, whom the Children clearly think of as parents. While unfortunate, the Court is without the power to change what happened in the past. Together, Parents continue to have difficulty in obtaining and maintaining appropriate housing, employment, sobriety, and relationships with the Children after more than five years total of services. Because of these issues, it is unlikely that the Children could be successfully reunified with their Parents.

E. Likely Date by which the Goal Might be Achieved

Due to the issues listed above and the long history of unsuccessful services, it is unlikely that the goal will be achieved in the reasonably foreseeable future, if at all.

F. Whether Reasonable Efforts were Made to Finalize the Permanency Plan in Effect

At the hearing, Mother raised the issue of whether reasonable efforts were made to finalize the permanency plan in effect. It does not appear that the Agency assisted Mother

13

in having visits with the Children during her incarceration. There also appears to be an issue as to whether the Children's foster parents were conducive to reunification since the children have had several issues with regard to visits between and contact with each other. Father did receive assistance from the Pressley Ridge in-home family reunification team and drug screens from Families United Network. Mother did receive assistance from Justice Works, Pressley Ridge, Life's Beacon recovery house, and Colonial House, and was unsuccessfully discharged from each program for failure to comply with requirements.

The Agency is not required to make perfect efforts or all efforts, but is required to make reasonable efforts. In this case, more than reasonable efforts were made. Mother was unsuccessfully discharged from each program due to her failure to comply with the program's requirements. Mother did not raise the issue of prison visits or that she needed more services during any of the dependency proceedings regarding her progress, or lack thereof. In fact, the hearing at which her parental rights were considered for termination was the first time that Mother raised the issue of whether reasonable efforts were made to finalize the permanency plan in effect. There had been five other family service plans in effect prior to this hearing. Mother did not use her best efforts to comply with the services that the Agency had provided to her. The Court finds that the Agency made reasonable efforts to finalize the permanency plans in effect; Mother did not.

G. Whether the Children are Safe

The Children are safe where they are presently staying.

14

## H. Analysis of Factors

The Children have been in placement for twenty-eight (28) months. Based on the above factors, especially the finding that reunification is unlikely in the near future, if at all, this Court believes that it is appropriate to change the goal. Parents have still not established that they can successfully obtain and maintain appropriate housing, employment, sobriety, and relationships with the Children. Parents cannot just drop in and out of children's lives. While Mother may have legitimate mental health issues that are hindering her ability to maintain contact, that does not change the fact that she has been unable to maintain consistent contact. There was substantial testimony regarding the Children's welfare being negatively impacted by the lack of permanence. The Children could be immediately placed for adoption because the Court will also grant the Petition for Involuntary Termination of Parental Rights. Therefore, a change of goal is appropriate in this case.

## II. Petition for Involuntary Termination of Parental Rights

CYF argues that the parental rights to the Children should be terminated pursuant to 23 Pa.C.S. §2511(a)(1), (2), (5), and (8) of the Adoption Act. Those subsections are stated as follows:

(a) **General Rule.** -- The rights of a parent in regard to a child may be terminated after a petition is filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

15

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services of assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

CYF has the burden of establishing by clear and convincing evidence that statutory grounds exist to justify the involuntary termination of parental rights. *In re Child M.*, 681 A.2d 793, 797 (Pa.Super. 1996). The clear and convincing standard means that the evidence presented by CYF is so "clear, direct, weighty, and convincing that one can come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1202-04 (Pa. 1989).

16

CYF must also present evidence proving that the termination of the parental rights will serve the children's needs and welfare. *In the Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 92-93 (Pa. 1998). Subsection (b) of 23 Pa.C.S. §2511 provides:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

CYF has proven by clear and convincing evidence that the parental rights of Parents should be involuntarily terminated pursuant to 23 Pa.C.S. §2511(a)(1), (a)(5), and (a)(8).

The most critical part of the court's analysis is the six months immediately preceding the filing of the petition. *In re D.J.S.*, 737 A.2d 283, 286 (Pa.Super. 1999) (*citing In re A.P.*, 692 A.2d 240 (Pa.Super. 1997)). However, the court "must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case." *Id.* (citations omitted). Furthermore, the Superior Court has stated:

> To be legally significant, the [post-removal] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of

17

proof on this question. *Id.*, ( *quoting In re Hamilton*, 549 A.2d 1291, 1295 (Pa.Super. 1988)).

## A. Analysis with Respect to Father's Rights

The Agency contends that this Court should involuntarily terminate parental rights under subsections (a)(1), (a)(2), (a)(5), and (a)(8). To satisfy this statutory provision, the Agency must prove by clear and convincing evidence that a parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. Additionally, the Agency must prove by clear and convincing evidence that termination of parental rights must best serve the needs and welfare of the Children. *See In re: C.G.*, 791 A.2d 430, 435-36 (Pa.Super. 2002).

In this case, Father has not been in contact with the Agency since April 20, 2015. Father's current whereabouts are unknown. The Court is satisfied that the Agency has proven that Father has refused or failed to perform parental duties with regard to the Children. Father signed acknowledgements of paternity for each child. However, Father has failed to inform the Agency or anyone involved of his whereabouts and has clearly made no effort to comply with the numerous family service plans generated in order to achieve reunification.

With respect to Father's rights, termination would serve the needs and welfare of the Children. The Children need structure and finality to their familial relationships. They have clearly lost their bond of affection with Father. One of the Children does not

18

even remember him, and the other two would like to see him, but have no desire to be reunified with him. Father is clearly incapable of providing the stable environment and relationship that the Children need. Therefore, termination would serve the needs and welfare of the Children.

Under any analysis of any factor, a parent who has absented himself from the process and failed to make contact with the Agency or his children for a period in excess of a year should have his rights terminated. Being a parent is an affirmative duty. The Court had to approve notice by publication because Father's whereabouts are unknown despite the fact that he knows his children are in care. Under §2511(a)(1), this evidences a settled purpose of relinquishing his parental claim to the Children and failing to perform parental duties. In this case, Father has made no effort to perform his parental duties. Under §2511(a)(2), Father's refusal to maintain contact has caused the Children to be without essential parental care. Under §2511(a)(5) and (a)(8), these factors are clearly present as the Agency cannot remedy a situation when they do not even know where Father is, despite efforts to find him.

B. Analysis with Respect to Mother's Rights

The Agency contends that this Court should involuntarily terminate parental rights under subsection (a)(1), (a)(2), (a)(5), and (a)(8). To satisfy this statutory provision, the Agency must prove by clear and convincing evidence that several conditions exist. First, the Children must have been removed from parental care by court order or agency agreement for at least six months before the filing of the petition to terminate parental

19

rights. Second, the conditions that led to the removal must continue to exist. Third, the parent must not be able or willing to remedy those conditions within a reasonable period of time. Fourth, the services or assistance reasonably available to the parent must not be likely to remedy the conditions that led to the removal within a reasonable period of time. Fifth, termination of parental rights must best serve the needs and welfare of the child. *See In re: C.G.*, 791 A.2d 430, 435-36 (Pa.Super. 2002).

The Agency also contends that this Court should involuntarily terminate parental rights under subsection (a)(8). Subsection (a)(8) allows the Court to terminate parental rights without any showing that the parents are likely to remedy the conditions that led to the placement, provided that the children at issue have been in placement for twelve months rather than six. *See In re: A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Aside from those differences, subsection (a)(8) requires clear and convincing proof of the same conditions as subsection (a)(5).

With regard to Mother, the Agency has proven its case with regard to §2511(a)(2), (a)(5), and (a)(8) as follows. With regard to §2511(a)(2), the Children have been removed from parental care for more than twenty-eight (28) months. The conditions that led to their removal still exist. Mother's employment, sobriety, and housing are still not stable. However, Mother has made more of an effort than Father to maintain contact and remain involved. The Court especially appreciates the progress she made while at Life's Beacon. It appears that being asked to leave that program was a serious blow to Mother. She struggled with overcoming that obstacle and returning to a path of recovery with her

20

mental health and substance abuse. Her current plan is to move in with a boyfriend with a history of violent crime. She appears to be moving in the wrong direction with regard to appropriate housing. While she has reasons for her repeated and continued inability to care for the children, the Court finds that she cannot or will not be remedying them by her plans for her current move or her current behavior.

With regard to §2511(a)(5) and (a)(8), despite the twenty-eight (28) months that the Children have been in placement, Mother still does not have appropriate housing. She has failed to work successfully with any team. She is still struggling with her mental health, according to her own testimony. Mother is still struggling with her substance abuse issues. Over a period of several months, the only drug test Mother was able to provide a sample for resulted in a positive indication for THC. This is not a stable sobriety situation. Mother has made no progress on housing and sobriety issues, which were the issues that precipitated the Children being taken into custody. Sadly, her middle child, when offered any wish, stated that he "just hopes my parents can get the help they need." The Court shares this wish but is constrained to find that the Agency has proven that Mother has failed to remedy the conditions that led to the placement.

Mother appears to be willing to remedy some of these conditions now, but it is too little too late and comes across as grasping at straws. Mother apparently cocooned herself in her apartment rather than affirmatively seeking treatment for her depression. Mother did not know the names of the Children's doctors or teachers and was completely unaware that she would need to inform herself with respect to her Children's special educational,

21

emotional, and developmental needs. Mother blamed the Agency for not providing her with more resources, despite being unsuccessfully discharged from at least four different programs for her failure to follow the programs' instructions. As of January 31, 2017, Mother had made no progress toward compliance with the most recent family service plan. Two of the Children had made full progress toward compliance with the most recent family service plan, and the third child had made moderate progress toward compliance with the most recent family service plan. The Children appear to be working to achieve reunification and permanence, rather than Mother. Therefore, Mother is either unable or unwilling to remedy the conditions which led to the placement.

The testimony has shown that further services will not benefit Parents. This time around, Parents have had almost three years, multiple in-home teams, counselors, and other professionals to help them remedy the conditions. Being a parent is an affirmative obligation, and this Court cannot foresee that further services will lead to any substantial improvements in the conditions. Therefore, it is unlikely that the conditions will be remedied within a reasonable time.

C. §2511(b) Analysis

1. Bond with Parents

The Pennsylvania Supreme Court has specifically noted that the Adoption Act requires that the trial court examine the effect termination will have on the needs and welfare of the children involved. *In re Adoption of Godzak*, 719 A.2d 365, 368 (Pa. Super. 1998) (citations omitted). Pennsylvania courts have recognized that emotional bonds are

22

just as important to consider as the conditions necessitating removal. *See In re C.P.*, 901 A.2d 516 (Pa.Super. 2006). The duty of being a parent "requires continuing interest in the child and a genuine effort to maintain communication and association with the child." *In re S.S.W.*, 125 A.3d 413, 416 (Pa.Super. 2015) (citations omitted). When evaluating this bond, courts are not required to use experts. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citation omitted). As such, "social workers and caseworkers can offer evaluations as well. Additionally, §2511(b) does not require a formal bonding evaluation." *Id.* (internal citation omitted).

Here, the caseworker testified that the Children's bonds with Parents have weakened over time. This is not surprising, as the parents have been inconsistent in their ability to maintain contact with the children. The Agency has been involved with these Children for almost half of the youngest child's life. The middle child indicated that she does not even remember Father. None of the children seemed to have any significant bond with Father. All of the children did have a bond with Mother. The Court, however, questions whether this bond has a positive or negative effect on the Children's needs and welfare. It is a parent's job to worry about children. It is not a child's job to worry about a parent. All of the Children are worried about Mother, and that is not their job. If a bond is only an anchor pulling Children repeatedly down, then it is perhaps a bond best broken.

The Children repeatedly stressed that their sources of anxiety stem mainly from the ever-present instability in their lives with regard to where they will be living in a few months and whether they will have a normal life with Parents ever again. At this point in

23

the dependency juncture, this is a fantasy. The Children have been in foster care for more than twenty-eight (28) months. They have clearly lost their bonds of affection with Father and their bonds of affection with Mother have diminished. The Children feel unsafe in Mother's care unless and until she could ensure her sobriety. Parents have been incapable of remedying the conditions which necessitated the removal. Parents cannot provide the stable environment that the Children need. Mother has not used her best efforts to overcome the obstacles barring her from a continuing relationship with the Children, and thus, she has continually failed to perform her parental duties. *See In re S.S.W., supra.* These Children want, need, and deserve a permanent, loving home with positive, appropriate role models. The Children need some structure and finality to their familial relationships. This need for permanency outweighs the emotional bonds the Children have left with Mother. Therefore, termination would serve the needs and welfare of the Children.

### 2. Bond with Other Siblings

The Court was particularly troubled by the foster parents' failure to facilitate visits between the siblings. After termination, the siblings will only have each other left from their former life. It appears that the Agency has located pre-adoptive homes for all of the Children, but the middle child will not be in the same home as her brothers. The Court should not have to decide between permanency for the Children and their ability to maintain their connection and bond with one another. The only reservation for the Court is the inability to ensure sibling contact following termination. The Court was quite clear

24

with the participants in the hearing that better efforts needed to be made in this regard and that a plan for continuing sibling contact should be in place prior to any adoption proceeding.

While the Court hopes that sibling contact will continue, because of the Court's lack of control following termination, the Court for this purpose will assume the worst case scenario, which would be a lack of regular contact between the boys and their sister. In that case, the Court must weigh the importance of the bond against the need for permanence. Even in that case, given the numerous placements and circumstances that these Children have faced in their young lives, the need for permanence wins out. The Court still stresses that there is no reason that this contact should not continue and specifically finds that it would be in the Children's best interests for them to have **both** permanence and continued sibling relationships.

### 3. Other Factors

The Court noted in its Finding of Fact the placement history of each of the children. The Court notes specifically that the youngest child has struggled in his ability to maintain his behavior in his various placement settings. The failure to identify appropriate pre-adoptive homes has been a factor in the delay in filing the petitions. The termination appears to be appropriate at this time as the current foster parents seem committed to creating permanent homes for all of the Children. While the situation is not ideal in that all the Children are not in the same home, they are geographically close together with the two boys in the same home. Therefore, terminating the rights of Parents at this point so that the

25

Children can be adopted into their current homes would best serve their developmental, physical, and emotional needs and welfare.

## CONCLUSIONS OF LAW

1. The current placement of the Children continues to be necessary and appropriate. 42 Pa.C.S. §6351(f)(1).

2. Parents have not complied with the family service plans. 42 Pa.C.S. §6351(f)(2).

3. The circumstances that necessitated the Children's original placement continue to exist. 42 Pa.C.S. §6351(f)(3).

4. The current placement goal of reunification of the Children with Parents is no longer appropriate and feasible. 42 Pa.C.S. §6351(f)(4).

5. The Agency has made reasonable efforts to finalize the permanency plan that was in effect during the Children's placement. 42 Pa.C.S. §6351(f)(5.1).

6. The Children are safe in their current placement settings. 42 Pa.C.S. §6351(f)(6).

7. The Agency has proven by clear and convincing evidence that Father by conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. 23 Pa.C.S. §2511(a)(1).

8. The Agency has proven by clear and convincing evidence that the repeated and continued incapacity, abuse, neglect, or refusal of Parents has caused the Children to

be without essential parental care, control, or subsistence necessary for their physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Parents. 23 Pa.C.S. §2511(a)(2).

9. The Agency has proven by clear and convincing evidence that the Children have been removed from the care of the Parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions that led to the removal or placement of the Children continue to exist, the Parents cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parents are not likely to remedy the conditions that led to the removal or placement of the Children within a reasonable period of time, and termination of the parental rights would best serve the needs and welfare of the Children. 23 Pa.C.S. §2511(a)(5).

10. The Agency has proven by clear and convincing evidence that the Children have been removed from the care of the Parents by the court or under a voluntary agreement with an agency, twelve months or more have elapsed from the date of removal or placement, the conditions that led to the removal or placement of the Children continue to exist, and termination of the parental rights of the natural parents would best serve the needs and welfare of the children. 23 Pa.C.S. §2511(a)(8).

11. Termination of all parental rights of the Parents to the Children would best serve their development, physical, and emotional needs and welfare. 23 Pa.C.S. §2511(b).

27

The following Decree and Order shall issue.

BY THE COURT:

March 20, 2017

KATHLEEN J. PRENDERGAST, JUDGE

28